Because we have so many issues, I'm not going to be able to spend a lot of time breaking down the counts for the Rule 29. I suggest you start with the strongest. Okay. That may be the only one you get. Okay. Thank you. I do want to touch upon a few, share some thoughts about the Rule 29 motion and the motion for new trial. I think the problem for the defendant in this case stemmed in large part from the State's characterization of the case as being a case involving a number of professionals who were all working in tandem or together, sort of pulling together, sharing the profits of their schemes, and interacting with each other sort of as a cohesive group. I think the evidence, in fact, really showed that these were competing professionals, competing in a sense, wearing different hats, so at times they worked together to conduct real estate purchases and sales. The working together and helping each other out in this fraudulent scheme, overall cash back fraudulent scheme, seems to have been enough for a Pinkerton theory in some of our cases. We have a pretty low bar where we say, like in the Olano case, where they're all representing their separate banks, but they help each other out on occasion. Why wasn't there enough here? I mean, Bernadelle sold his own personal residence to the other group. They were all helping each other out in their various schemes. Well, yes, there's certainly an element of that in this case, but there are many counts. And if you take a look, if you break it down count by count, you notice with the mail fraud counts, for example, counts 2 through 7. If you look at each and every count, count 2, Lucero, for example, was orchestrating that. Count 3, Lucero. Count 4, Adorno. Count 5, Lucero and Adorno. Count 6, Branch. Count 7, Weber. Now, those are just the mail fraud counts. So what difference does that make if they were all in the scheme together? Does it matter who took the lead and who went along in a particular transaction? If they all were in the big picture together, does it matter who took the lead on a smaller segment of the scheme? Put that way, probably not. But I don't accept the premise, necessarily, that they were all together. Okay. So for a Rule 29 motion, we have to construe the evidence in the light most favorable to the government's theory. Right. So with that standard in mind, is your answer the same? Yes, under these circumstances. Because, again, I don't think that the evidence showed that these individuals were all working together in a continuous sort of joined manner. What was the evidence in the record that supports your position that there was, that they were not working together? Well, the government characterized Bernadelle as somebody who took Lucero and Adorno and some of these other people under his wing, taught them things. Wasn't there evidence in the record of that? Well, there was evidence in the record that he shared information with them. And my argument was — But they did deals together, too, though, right? There was evidence of that? There were some deals together, correct. But I'm — what I was about to do is focus on the actual counts of conviction and just talk a little bit about those for just a second. And just note that with each of the mail fraud counts, there was also a money laundering count. And, for example, counts 2, 3, 4, and 5 of the mail fraud counts, there was a corresponding money laundering count that involved taking these funds, taking the funds that arrived at the title agency, the funds that were used to fund the loans, some of that money then going to the principals or the people who were recruiting the — That was the cash back part of it. The cash back part. So they would get more money from the bank than the house was worth. The person who was the appraiser in the scheme would appraise the house for more than it was worth. The person who was doing the escrow would doctor up their HUD form to justify the extra money. And then the money — extra money would go into the pockets of the people, the straw buyer and the person who was allegedly selling the house. So it's hard for me to understand how you say that everybody was not working together in a scheme of that nature. Okay. Well, a couple of points. First of all, Lucero and Adorno, they had their own business. They were doing their own thing. They took some information that they claimed they got from both Bartlemus, who was the escrow officer on a lot of these deals, and Bernadelle, and they went off and they recruited friends, family members, and they started doing these deals based upon information they had gleaned from Bernadelle. And one of those deals, for example, Bernadelle shows up at the closing and says, don't worry, this is perfectly legal. So it just seemed like there were contacts and connections so that they were helping each other in the scheme. Well, again, I can't disagree with that. There is evidence of that going on here. But we have to go back to the counts of conviction. And, again, looking at the mail fraud counts, there were in the corresponding money laundering counts, in counts 2, 3, 4, and 5, the jury found not guilty on the corresponding money laundering counts. So that, to me, that shows that the jury was looking at the evidence very carefully in determining whether or not each one of the counts was proven beyond a reasonable doubt. That doesn't – that does not mean that there wasn't an overall scheme, though. I think that the jury did its job in that respect. Well, I understand what you're saying, Your Honor. But if we go on to the wire fraud counts, again, count 8, 9, 10, and 11, these transactions – the evidence in the record shows these transactions were orchestrated by Lucero, Lucero, Adorno, Lucero, all not guilties on these money laundering counts. And the money laundering counts were absolutely connected to the funding of the loans. So what do you think – what are you saying that establishes the fact that they were found not guilty on the money laundering counts? What does that – how does that help you in your Rule 29 argument? I think it's evidence that the jury went too far with the Pinkerton idea. The government was able to convince them that simply because Bernadelle had shared investment strategies with these other people, some of these other people, that he was, from that point on, responsible for all of the things they did. And so they found him guilty on the funding aspects. In other words, the loan application, the loan package aspect, the funding aspect. They found him guilty on all those, I think, under a Pinkerton theory. It's hard to explain why juries decide anything the way they do. It could be compromise verdicts. It's, you know, jury notification. We never can be certain why a jury decided something the way it did. That's – I accept that, Judge. That is true. But, again, the record shows, if you go into the record, it shows that Lucero, Adorno, and others actually controlled these transactions. It also shows that these people had their own businesses. They were doing things Bernadelle didn't even know about, had no idea about. So we have cases, though, in the Pinkerton area which says that the defendant doesn't have – can still be held responsible for subparts of the scheme that he doesn't even know about. So the lack of knowledge does not make it inappropriate to charge the defendant we've held. Right. And I accept that. But that's not exactly what was going on here, according to the evidence. According to the evidence, he was – he had not joined forces with Lucero and Adorno. I use them principally because they're involved in most of these counts. He did not enter into an agreement, form the intent to commit these acts, to engage in these transactions with these – with them in most of these cases. The evidence supports that, and that's what I base the Rule 29 motion on. It looks as though the jury just assumed that because he had told them things and they had gone and used that information without his involvement, without even his knowledge, that he was guilty. And so I think – I think a review of the record shows that in many of these wire fraud counts, mail fraud counts, there simply wasn't any evidence that he knew about these things, that he was involved, that it formed any intent, that he benefited in any way from these transactions. There's a paper trail showing where the money went in all of these cases, and virtually very little of it went to Bernadelle. So I'm asking the court to look at these counts and determine whether there really was any evidence or whether the jury just got swept up in this idea that Bernadelle's responsible for everything everyone else does because he put the idea in their head or he gave them information. Counsel, are you making an argument that the jury verdicts were inconsistent? Well, I suppose in a way I am because it just – understanding how these transactions work, I don't know how a jury acquitted on – I'm sure Mr. Bernadelle's happy they did, but I don't know how they acquitted on those money laundering counts that are absolutely, inextricably connected to the – to these wire and mail fraud counts. Wasn't the money laundering counts, at least the ones that we have now, were done on an aiding and abetting theory rather than on a Pinkerton theory? Well – Which is a different standard. Right. But aiding and abetting still allows a lot of leeway. But not as much. Not as much. Not as much. Right. I think it's still a good argument, though, even using the aiding and abetting. Now, did you make the inconsistent jury verdict argument to the district court? No. And I didn't handle a case at the district court level. But did the case counsel make that? I don't think he did, honestly. All right. If I may, I'm going to jump to the loss calculation. I think that's what was really driving the sentence in this case. This is an extraordinarily long sentence, 200 months, where the co-defendants in this case who pled guilty got very nominal sentences, in some cases tantamount to probation. And in the case of three of the actors, Bartlemus, Lucero, and Adorno, Bernadone was arguably less culpable. There are two problems that I see with the loss calculation here. There's a question as to whether Judge McNamee used the proper standard of proof, whether it was clear and convincing evidence, which I think he should have used under the circumstances rather than by a preponderance. And then the methodology employed here. I understand that there's a difference in terms of how much information or how accurate the loss figure has to be for the purposes of this guideline versus for the purposes of restitution. I understand that. Counsel, is there a clear and convincing standard of proof when the loss amount is based on conspiracy evidence? Isn't there a difference? I understand that there are opinions in this circuit and other circuits that say something to that effect, that the due process issue, which is what we're really talking about here, preserving due process for the defendant. The due process issue is better taken care of when the loss figure is driven, well, is driven by the fact that there was a conspiracy. Because presumably at least the jury has considered that in finding guilt on the conspiracy count. However, in this case, we have no idea how broad the jury's verdict was on the conspiracy count. There's just no way to know under the circumstances. And the real concern I have here is the methodology. Well, there are two concerns. Obviously, the degree to which the loss figure drove the sentence, the 18-level enhancement changed the sentencing range from 27 to 33 months on the one hand to 188 to 235 months on the other hand. That is a huge increase, which I would submit, given that there was no jury finding on the loss, that only 8 of the 15 properties comprising the loss schedule were connected to actual counts of conviction. There's a real due process issue here if the judge didn't use the clear and convincing evidence standard. Now, Judge McNamee did use the word clearly a couple of times when he was describing the quantum of evidence. But he never stepped back and said, I'm changing the standard here just so everybody knows. I'm not using the preponderance standard. I'm using the clear and convincing standard. And I believe that by clear and convincing evidence, the State or government, rather, has met its burden here. So I think there's a real concern there. Now, the methodology is equally concerning because the method used here was the difference between the original sales price early on and the foreclosure amount way down the road. Was there evidence that the purchase price, which the district court used, was the same as the loan amount? Well, to support its position, the government used tax reports. And in the tax report, the tax reports are not very informative. In the tax reports, there are different figures in most of the cases here, if my memory serves me, between the sales price and the amount financed. In other words, those figures are in the tax reports in most cases. And it looks like there is a difference. When you're referring to the tax report, are you referring to the MLS listing sheet that was in the record that had a line about tax information, or were there actual reports from state county entities about property tax? What are you referring to? Well, it looked – Mr. Rapp will be able to help us here – but it looked as though, to me at least, these were Internet-generated actual tax reports showing the transfer of the property, not necessarily the loans on the property or the security interest, but the properties themselves and what they brought each time the property – the ownership interest in the property changed. They look like tax reports to me, and they were exhibits presented to the district court by the government in its motion – in its sentencing memorandum. But the problem with those reports is it starts with the sales price rather than the loan amount. Obviously, loss is going to be based upon the loan amounts adjusted by other figures or other features or conditions. We don't know whether the difference between the sales price and the loan amount was a down payment, for example. If it was a down payment, then the lender lost less money. If it was a carryback, we don't know how much of the carryback was paid back. If it was a HELOC or something like that, we don't know how much of that was paid back. We don't know how much the initial lenders received when the security interest changed hands, when the notes and security interest changed hands. We know they did change hands, though, because I provided the court with a chart showing who the original lenders were in each case and then who purchased the property at the trustee sale. And normally, the lender who's holding the note bids at the trustee sale and bids the balance amount. So we know that they changed hands. We don't know how many times. We don't know when. We don't know what they received in consideration each time it changed hands. But we do know that these properties were, at least the notes were changing hands in a very precipitously declining real estate market. Did you want to save any time for rebuttal, counsel? We're down to one minute and 50 seconds. Let me just jump to the Santos argument real quick, because I do want to touch upon that. That would, if we're correct on that, he would be entitled to a new trial on the money laundering counts, at least three of the four of them. I think that the evidence shows that those cashback amounts did merge with other counts in the indictment. And I've set forth in my brief which counts I think they merged with. Clearly, those monies were not profits. Only some of it was profits. Clearly, it was used to further the scheme, if you will, by providing funds for the investor, which had to be paid, and then protecting the investor, which had to be done. Because if you don't protect the investor, the properties go into foreclosure. The investor is unhappy and cannot be used again. Counsel, the problem with your argument is that there was significant evidence that the greater portion of the cashback amounts to your client was used to support his lavish lifestyle, and that would not merge with any of the counts of conviction. And that's true, and more so in some counts than others. But the problem here is the jury was not told that they were to determine how much of those cashback amounts were profits and how much were used to further the scheme. And because they weren't given that opportunity, we don't know whether in each and every count it was over $10,000. And Mr. Bernadelle was entitled to have the jury determine whether the $10,000 threshold in each and every count was met. I'm out of time. Thank you, counsel. We'll give you one minute for rebuttal. Thank you. We'll hear from the government. Good morning. May it please the Court. Kevin Rapp from the United States Attorney's Office, District of Arizona. I'll start with the Rule 29 argument. The Court has focused on the fact that this defendant introduced a number of the co-conspirators to each other. It didn't stop there. He actually benefited from them engaging in these transactions. For example, he used their straw buyers to sell his own properties. A number of those straw buyers testified at trial. For example, Amanda Dorno, who he first contacted, she needed a job. He put her with April Lucero, who was a loan processor. April Lucero up to that point had been processing many of these cashback loans for the defendant where he was using straw buyers. Amanda Dorno began to work with April Lucero, and she, too, began to process these straw buyer cashback loans. Eventually, they decided to go out on their own, and they did so. But Mr. Bernadelle actually used a number of their straw buyers. For example, at trial, a number of straw buyers testified. Kevin Williams was a straw buyer that Amanda Dorno had used to purchase seven properties. He showed Kevin Williams one of his properties, although Kevin Williams did not purchase the property. Christina Shiplett was brought to Mr. Bernadelle. Mr. Bernadelle used Christina Shiplett to sell one of his properties. Amanda Dorno's parents bought a number of properties, and eventually Mr. Bernadelle used Amanda Dorno's mother to sell many of his properties, too. Why is it that the government relied on, for so many accounts, all the mail fraud, wire fraud, bank fraud, on parts of the Enterprise Run schemes where Bernadelle had no actual contact with? That just seems a little bit odd, in that they were totally separate. Well, on those particular accounts, Your Honor, we were traveling under a Pinkerton theory. They were substantive accounts that the defendant could reasonably foresee as a natural consequence of this scheme. It was in furtherance of the scheme, and here's why. The defendant went back. It isn't as if this defendant just simply explained to them the methodology in doing these schemes and disappeared. He came back and forth into their transactions, as I've noted. But there's no evidence as to these specific accounts that he was involved, is there? For some of them, no. There's some of them he did not have direct or he did not aid and abet the fruition of those transactions, but they were a natural consequence of this scheme to defraud. And he benefited ultimately from these transactions because he was able to borrow money from his co-conspirator, Amanda Adorno. He borrowed upwards of $90,000. When he first met her, she had no money. The only source of this income could have come from him engaging in these cashback transactions. Let me ask you about one of the money laundering counts that I was worrying about, and that's on count 18. Given that it was under an aiding and abetting theory, what evidence was there that Bernadelle met the aiding and abetting standard for that transaction? I believe this was the transaction where Amanda Adorno's mother buys a property and there's cashback. This is the transaction where he's actually down at the escrow office when she's engaging in this transaction, and she looks to him to provide information about whether or not the transaction was legal. According to my notes, this was the 13699 North 71st Drive property. Is that the one you're mentioning? Because according to my notes, it was sold to McWilliams and then Shiplett. I'm sorry. You're correct. This is a Stephanie McWilliams. The defendant did not have direct contact with that particular transaction. Well, then how do we get to aiding and abetting for that? Well, under that transaction, because he had contact with Christina Shiplett, who was one of the purchasers ultimately of that property, it's under a Pinkerton theory. But is that what you pursued? Because according to my notes, it was under an aiding and abetting theory for this count, not under a Pinkerton. This is the money laundering count. I see. I believe, Your Honor, that the money laundering counts we pursued under a Pinkerton theory or an aiding and abetting a theory. On that specific count, I believe that it was a Pinkerton. It was Pinkerton. Okay. I'll check that. Well, in essence, every count is aiding and abetting in addition to the direct involvement. Yes. Whatever theory the jury believed there was evidence of, either, and we advanced all three theories, direct evidence, aiding, abetting, and Pinkerton. The defense brought up the methodology for loss, which I'd like to address. There's, first of all, I think there's some mischaracterization of the evidence. On page 9 of the defendant's reply, the appellant's reply brief, he lays out what he believes are the original lenders and the ultimate purchasers of the loans. Those original lenders were not conventional lenders in the sense that, for example, there's two lenders, Lehman Brothers and Washington Mutual. These would be conventional lenders that funded the loans. The other entities that funded the loan were actually mortgage brokers. They weren't lenders in the sense that they were actually funding the loans. They were simply brokering the loans. This successor argument that the defense made in relying upon the James case, and in that case, the court, the district court specifically found at the, at sentencing that the defendant could not foresee these successor lenders. That case has just recently been distinguished by the U.S. v. Washington case. In that case, the court found that the defendant could see, could foresee a successor lender, the reasonably foreseeable pecuniary harm to a successor lender, primarily because the defendant in that case was a sophisticated investor. In this case, there was prodigious evidence of this defendant being the leader of this conspiracy, that he was sophisticated in bringing these transactions to fruition. He was the one recruiting the loan officers. He was the one that was cultivating the escrow officer. In the record, there is evidence that the defendant tells one of the loan officers, Sean McLaughlin, that he had upwards of 60 properties to sell. It would be a foreseeable pecuniary harm to this, to Mr. Bernadelle, that these loans would be sold. Counsel, go ahead. Could you articulate to us exactly how the loss calculation was done? Certainly. What numbers were used? Certainly. And I think there is some misunderstanding about the evidence in that regard. We took the original loan amount. Because the PSR says the purchase price. Right. And the evidence that the district court relied on seemed to start with the purchase price. And then you said in your briefing, no, that's the loan amount. But I didn't see that in what the district court was relying on. Let me explain that. The – we started with the initial loan amount. That was the amount of the loan before it went into foreclosure. And that – the evidence of that was not only these tax records, which has been discussed. The tax records contained the first mortgage. The tax records. What are the tax records you're talking about? All I saw was this, like, proprietary printout from a real estate service. This is the MLS, the multiple listing service. Yeah. Is that what you're talking about? Are there official tax documents? There's a link. And this is in the record at sentencing. There is a link to that, the Maricopa County, which is the county that Phoenix is in, the Maricopa County tax records. And you start with the MLS. That link takes you to the tax records. That wasn't printed out? It was just the court went to that link and looked at the records? No. That was an exhibit that was attached to the government's supplemental sentencing memorandum. Was there a printout of the Maricopa County tax records? Because I didn't see that. Yes. They are the Maricopa County tax records, but the heading is multiple listing service.  So that link, your representation is that link is what is actually in the record, even though the header says MLS, but the data. Yes. But it says under the data, don't rely on this for any purpose. Well. So I was a little confused when I saw that. Here's the district court judgment. But the district court relied on it nevertheless. Found it to be reliable evidence. But the initial loan amount was based not only on those records, but also the HUD settlement statement, which was introduced into evidence for every single transaction at trial. And on the HUD settlement statement, not only do you have the first mortgage, which is what you find in these tax records we've been referring to, but you also find the second mortgage. And each one of these properties were financed 100 percent. And so what those records do not pick up is that second mortgage, but that second mortgage. That's added to the first mortgage to make the purchase amount. Yes. But I didn't see, I didn't see in your briefing, and I didn't see in the record, anything showing that the purchase price was equivalent to the loan amount. What's the best place I can look that will actually make that argument, or that that evidence was presented to the district court? Well, as our exhibit to our supplemental, our initial sentencing memorandum, we have an exhibit that sets forth all the amounts. And although it may not be in the record at sentencing, it's never contested that that's, this is at, only in the reply brief does the defendant first contest that this loan amount and the sale amount are something different. Was that evidence adduced at trial? Yes. In excruciating detail. Because there were approximately 37 properties that were presented at trial, and the escrow officer who was complicit with the defendant was the primary witness in that regard. And that, and each one of those escrow files, he went over and certified the accuracy of the HUD settlement statement. And on the HUD settlement statement, you'll find not only the first mortgage, but the 20 percent second mortgage, together they make up the loan amount. And that is the amount that the government is relying upon before you subtract out the amount that the property went into foreclosure, that the property was sold in a short sale, or there was just simply a credit bid at the trustee's sale. That's the methodology that was used at sentencing. The defense also makes a number of arguments regarding the methodology that there was mortgage insurance, and that mortgage insurance, by virtue of the fact that there was mortgage insurance compensating the lender, then you wouldn't have a loss. That's an unavailing argument because now the mortgage insurer simply just steps into the shoes of the victim lender. With respect to the argument that there were a number of payments made on these homes that would have reduced the loss amount, that, too, is an unavailing argument. Most of these homes went into foreclosure a year to two years after they were originated. The amount of payments that would have reduced the principle of these loans would have been de minimis. With respect to some of the other arguments that the defense has made, the gross receipts argument, this was a two-level increase for receiving a million dollars from a financial institution. It was based upon two figures. One, some bank records that the government was able to attribute to the defendant that was not available to no fault of the government at trial, but was ultimately available at sentencing. In those bank records, it demonstrated that the defendant had received $1.7 million emanating from these transactions, and the government was able to connect that money to the transaction. That was the first amount of money that was attributable to this particular. What are you talking about? What document or what? Because I saw the argument about the FBI agent's report, which opposing counsel says wasn't specifically tied to the various properties at issue. This is an exhibit to the government. Is that a different one? I'm sorry, go ahead. I'm sorry for interrupting, Your Honor. This is an exhibit that's attached to the government supplemental sentencing memorandum. And this is basically what the government did was supply the defense these bank records, and they are, too, attached to the government supplemental sentencing memorandum. And those bank records were analyzed by the agent, and the agent was able to connect each one of the money the defendant was receiving to a subject property. The evidence at trial ---- So the defendant's report was not directly informative, or was that through testimony or how was that connection made? It was from just the agent analyzing it. But that's ---- Did he have a report? No, there is no report. How did his analysis ---- how did you present that to the judge, his analysis? We took the bank records, went through the bank records, aggregated the deposits into the defendant's account, traced those deposits from, in many cases, a title agency, security title agency. A check from the title agency. Yes. Went into the account, connected to the sale of a property. Yes. And where was that documented, that connection, that tracking? That was just documented in that ---- in the exhibit attached to the report. You're saying because all that I saw was like a chart that didn't really have any specific information about the tracking. We argued that at sentencing, that this is ---- we told the ---- we advised the court the manner in which we put that chart together. Okay. So you ---- But we had, Your Honor, I don't mean to interrupt, but we had the underlying bank documents were supplied to the defense. It was ---- At sentencing, did you ---- were you trial counsel, by the way? I was. So did you make the representation to the court that in our supplemental sentencing statement, we have attached and this is what it shows, or did the agent make the representation to the court regarding how everything had been tabulated? I did as counsel. You did as counsel. And it simply was just a summary chart. We supplied the defense the actual raw data from the bank records, and we presented that summary chart at sentencing. And did the defense counter that evidence or make any objections to the evidence? They did. They did. Their argument was based on you can't really show that all these were legitimate ---- illegitimate transactions. And our counter to that was after the three-week trial, there was no evidence that this defendant was engaged in any legitimate transactions.  Now, let me finish this one point. Okay. Did the district court hear all of this and resolve the issue in favor of the government's presentation of evidence? Yes, Your Honor. And, indeed, with the two-level enhancement, the court found that there was clear evidence that ---- Now you can finish your point. That $1.7 million, we didn't stop there. We also relied upon the fact that this defendant had originated loans for straw buyers, but he kept those loans under his control. For example, he did a number of loans with his brother where the actual properties were quick claimed into the defendant's LLC, and he received benefits from that. And the court relied upon, in an aggregate, those loans well exceeded a million dollars, and the court relied upon that amount of money as well in aggregating the 1.7 from his bank records and the additional money from the loans that he had originated. Can you address the Santos instruction issue? Was it reasonable for the district court, under a plain error review, to say that the cash back component wasn't part of the mail fraud, wire fraud, bank fraud scheme, given that you used HUD-1s, which was identifying that? Yes. First, Santos, of course, was a promotional money laundering case. This was a transactional money laundering case. There was no merger in this case, because the mail fraud, the bank fraud, and the wire fraud was separate and distinct from the money laundering. But the HUD-1 was part of that scheme, which was used to get the bank, you know, to conceal the fact that some of the money from the bank was going to these LLCs. That was the second component of the fraud. Really, the wire fraud, the mail fraud, the bank fraud was predicated on the originated loan, which was based upon the false information to the bank, not necessarily from the HUD-1, but from the loan applications for the straw buyers. That's really the first component of the fraud. That loan application would be provided to the bank either by wire or by mailing. They would fund the loan based upon that false information. Once that money would come into the escrow company, then a second wire would go out from the escrow company's bank into an account controlled by the defendant or one of the co-conspirators. And it's that separate transaction that is the basis of the money laundering. The money coming into the account is the dirty money because it's based upon the false information. The money going out into this account controlled by the defendant or one of his co-conspirators is based upon that dirty money, and each one of those transactions exceeded $10,000. And so in this case, a Santos instruction was not appropriate. The end game of this transaction was the cashback. It was the profit-generating portion of this scheme. Had this case been about just simply getting straw buyers to originate loans, it is unlikely that the defendants would have been able to make the amount of profit they did without that second component, which is the cashback, which the Court has identified was the, based upon that inflated appraisal. So last, I do want to make one last argument regarding the methodology. Because of the recent case of United States v. Young, Y-E-U-N-G, in that case, this case, that case, as this Court very well knows, was a restitution case where the precision on determining what the lender had to have lost had to be based on much more precise information. In this case, the Court made the loss calculation based upon a correct methodology based upon the available information, not only just these tax records that we've been referring to, but also evidence that was presented at trial, and found that it was within the range of $2.5 to $7 million. All right. Thank you, counsel. You've exceeded your time. We'll give you one minute for rebuttal. Very quickly, Your Honors. On the Santos issue, the evidence is clear, and it's been, I think, briefed clearly enough for the Court to agree that there is no way that these individuals who were using this template for buying and selling properties could have done this for any sustained period of time without paying the investors and without servicing the loans. And that money came out of those cashbacks. We don't know how much in each case, because the government didn't have to prove it. But if there's no merger, then we can consider all proceeds. We're not limited to profits. Right. But I believe there was a merger. And, again, I set forth the counts that I thought that those transactions merged with. And so that's our position there. On the Rule 29 thing, with all of these other counts, even under a Pinkerton theory, simply sharing information with somebody over a beer or however it happened about one's investment strategies does not cause one to be responsible for the use of that information by other people in other places at other times without the knowledge of the person sharing the information, certainly without any proven intent that they use that. Even if it's reasonably foreseeable that those people will ascribe to the same illegal theory, illegal practice? Well, I don't think so, because I think that it creates a net that is so broad that it's hard to imagine how many people would be swept up in it if conversations about practices used by a person, in this field, could then cause that person to be culpable. But that's what the conspiracy theory is all about in the criminal arena. Well, as long as the two agree that they are going to conspire together to commit a criminal act, yes. Pinkerton. That's what Pinkerton is about as well. But I think there still has to be culpability, knowledge, intent on the part of the person sharing the information. There has to be some criminal culpability there that goes beyond simply sharing the information. What about the government's representation that your client went back to the straw buyers that were cultivated by the individuals he had the conversation with? Wouldn't that be enough to sweep them into the Pinkerton net? That he went back to them later? Yes. Well, if that's, if the evidence showed that he, that he, I suppose that would be evidence after the fact showing intent before the fact, if I follow your question. Okay. All right. So could you wrap up, please? We understand your argument. Thank you. So if you could just wrap up, that would be great. Yes. And with respect, my final thought, with respect to the, the property loss, I think the judge clearly used Exhibit A, and I appreciate Your Honor's inquiries along those lines, clearly used the exhibit that I put in the, in my brief, laying out how the judge measured the losses. It's to the penny from, from Exhibit A. It, it, it doesn't refer to other exhibits or anything like that. All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. The final case on calendar for argument today is United States v. Inyawu and Uday. Good morning, Your Honors. Good morning. Eric Babcock, appellant, Hysynth Uday. All right. For both. Thank you. May it please the Court, I'd like to start with a brief personal story, because on the way over here this morning, I was cited for making an improper left turn. And the officer pulled me over, wrote the citation, showed it to me, explained what it was for, and I signed it. And the way it goes some days. Well, ironically, Mr. Uday was given about $2 million in loans, and to this day, no one really knows whether he signed those loan applications. He – there were abundant signatures shown to the jury. There was no expert testimony presented, but – Does there have to be for the jury to make a determination as to whether or not a signature is valid? No, there doesn't.
judges: Hug, Rawlinson, Ikuta